# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEROY HARRIS | : | CIVIL NO. 3:17CV1614 (AWT) |
| | : | |
| | : | |
| VS. | : | |
| | : | |
| FIGURA, ET AL. | : | MARCH 22, 2019 |

## DEFENDANTS' LOCAL RULE 56(A)(1) STATEMENT

### Correction Officer Kudzal

1. In June of 2016, Officer Kudzal was assigned as a property officer in the Admitting and Processing Room (A & P Room).  When inmates transfer into and out of Corrigan Radgowski CC, inmates are processed in the A & P room.  As the property officer, his responsibility is to go through the inmate's property box(es) and make sure the inmate's property complies with DOC's directive.  Officer Kudzal makes sure that the inmate does not have any contraband in his property and does not have an excess number of items permitted in the directive.  (See Ex. 1, Aff. of Officer Kudzal, at ¶ 3).

2. Although it was not his primary responsibility, Officer Kudzal would also strip search inmates during processing if the shakedown officer needed assistance.  (*Id*. at ¶ 4).

3. Shortly after an inmate is admitted and processed, he is then seen by a member of the medical staff for screening purposes.  This screening occurs in the A & P Room.  (*Id*. at ¶ 5).

4. According to the RT60 record, Mr. Harris transferred to Corrigan Radgowski CC on June 14, 2016.  (*Id*. at ¶ 6).

5. Officer Kudzal does not recall whether he processed Mr. Harris when he transferred here or whether he confiscated Mr. Harris' knee brace.  (*Id*. at ¶ 7).

6. There is a facility policy that prohibits inmates from having metal property because of safety and security concerns. An inmate can easily sharpen metal into a shank and can use it to harm himself, other inmates, and staff. (*Id*. at ¶ 8).

7. If Mr. Harris transferred into Corrigan with a metal knee brace, Officer Kudzal would have confiscated it pursuant to facility protocol while he was admitted and processed. Mr. Harris would then be seen in the A & P Room by medical staff so that they could screen him and address any of his medical concerns. Officer Kudzal assumes this would include any issues regarding his knee and any alternative knee braces. (*Id*. at ¶ 9).

8. Officer Kudzal did not remove the plaintiff's cane.

Q:     Did Officer Kudzal remove your cane?

A:     No, he didn't.

(Ex. 6, Tran., at p. 45: 19-20).

Nursing Supervisor Knight

9. Nurse Knight was the nursing supervisor at Corrigan Radgowski CC from January 2015 until March 2017. As the nursing supervisor, her responsibility was to oversee the registered nurses and licensed practical nurses at the facility. (Ex. 2, Aff. of Nurse Knight, at ¶ 3).

10. Nurse Knight does not recall having any personal interactions with the plaintiff, Mr. Harris. (*Id*. at ¶ 4).

11. The only involvement she recalls with regards to Mr. Harris was when Deputy Warden Zegrazewski emailed her in February 2017 regarding Mr. Harris' knee braces. To her knowledge, this was the first time that she became aware of Mr. Harris. (*Id*. at ¶ 5).

12. Nurse Knight reviewed Mr. Harris' medical chart and learned that his knee braces had been removed from his property in June 2016 and that he had passes for a cane and bottom bunk pass. (*Id*. at ¶ 6).

13. After reviewing his chart, Nurse Knight placed Mr. Harris on the doctor's sick call list to be seen for evaluation regarding any need for knee braces. (*Id*. at ¶ 7).

14. To her knowledge, she had no other involvement with Mr. Harris' medical care during his incarceration. (*Id*. at ¶ 8).

Dr. Figura

15. Dr. Figura worked for Correctional Managed Healthcare with the Connecticut Department of Correction (DOC) from March 2015 to July 2018 and was assigned to Corrigan Radgowski CC. (Ex. 3, Declaration of Dr. Figura, at ¶ 3).

16. She was responsible for treating inmates at the facility. She would see between 12 to 20 inmates per day for medical treatment. (*Id*. at ¶ 4).

17. For a non-emergency medical appointment, an inmate must request to be seen at nurse sick call. The nurse will provide treatment, and if necessary, refer the inmate to an APRN or a physician at the facility. (*Id*. at ¶ 5).

18. To Dr. Figura's knowledge, this screening process is the only way that an inmate can be seen by a physician for non-emergency matters. There is no facility procedure for an inmate to directly send requests to a physician for an appointment or treatment. (*Id*. at ¶ 6).

19. Medical staff provided Dr. Figura with a predetermined schedule every day with a list of patients. The only way that she would schedule an inmate for an appointment was if she

had previously seen an inmate for treatment and then scheduled him for a follow-up appointment. (*Id*. at ¶ 7).

20. Although Mr. Harris had been previously seen by nurses and an APRN at Corrigan, the first time Dr. Figura became aware of Mr. Harris was on July 6, 2017 when he was placed on her sick call list. This was the first time that she saw Mr. Harris, so a nurse must have placed him on her list to be seen. (*Id*. at ¶ 8).

21. He complained about pain in his right knee and his braces that had been removed. Dr. Figura reviewed his chart and his x-rays of his right knee and hip that were done on March 23, 2017. She also examined his knee. Dr. Figura's impression of his right knee was severe arthritis. (*Id*. at ¶ 9).

22. Mr. Harris already had a cortisone shot for his knee and reported that dolobid was helping with the pain. Mr. Harris was also scheduled for alignment x-rays at the UConn Health Center. (*Id*. at ¶ 10).

23. Dr. Figura noted that he had been provided a neoprene brace in March of 2017, which is documented in his medical chart. (*Id*. at ¶ 11).

24. Because Mr. Harris already had a dolobid prescription, a cane pass, a bottom bunk pass, and a neoprene brace, Dr. Figura's medical opinion was to continue with his current treatment while he waited for his alignment x-ray appointment. (*Id*. at ¶ 12).

25. Although Dr. Figura saw Mr. Harris for his knee complaints, his primary concern on July 6, 2017 was a rash on his chest and a stuffed nose. She prescribed Mr. Harris with clotrimazole cream for his rash and nasal saline for his nose. (*Id*. at ¶ 13).

26. Dr. Figura also noticed that Mr. Harris' blood pressure was high, so she recommended blood pressure checks twice per week. (*Id*. at ¶ 14).

27. The medical chart shows that Mr. Harris received his regular blood pressure checks in July 2017.  (*Id*. at ¶ 15).

28. The next time Dr. Figura saw Mr. Harris was on August 28, 2018 for MD sick call.  The primary reason for seeing Mr. Harris was for hypertension and to evaluate him for an albuterol (inhaler) prescription.  (*Id*. at ¶ 16).

29. Mr. Harris asked about his appointment for his knee alignment x-ray, which had already been scheduled.  Dr. Figura evaluated his knee.  The joints surrounding the knee were intact and he had normal muscle tone and no atrophy.  Her note also indicates that she submitted a URC request for ortho and for an alternative knee brace.  (*Id*. at ¶ 17).

30. Mr. Harris had his alignment x-ray done at the UConn Health Center on September 22, 2017.   (*Id*. at ¶ 18).

31. On September 27, 2017, Dr. Figura submitted a request for a follow-up appointment with orthopedics at the UConn Health Center.  This request was approved on October 12, 2017.  (*Id*. at ¶ 19).

32.  Dr. Figura saw Mr. Harris on October 11, 2017 to review his x-rays with him.  She examined his knee and lungs.  Mr. Harris' right knee had severe arthritis and 15 degree valgus and normal valgus on his left knee.  At this time, Dr. Figura gave Mr. Harris a different type of brace for his knee.  This brace had metal, which she had to remove because of the facility's policy that prohibited inmates from having metal objects in their property.  (*Id*. at ¶ 20).

33. According to DOC's records, Mr. Harris discharged from DOC on November 21, 2017.  Dr. Figura is not aware of whether Mr. Harris was able to see the orthopedic surgeon prior to discharging from custody.  (*Id*. at ¶ 21).

34. Dr. Figura understands that Mr. Harris is complaining that an officer removed his metal knee braces when he transferred to Corrigan Radgowski CC. There was a facility policy that prohibited inmates from having metal objects in their property for safety and security reasons. (*Id*. at ¶ 22).

35. As a physician, Dr. Figura had no authority to override this policy and provide Mr. Harris with a metal knee brace, however, Mr. Harris received treatment for his knee including x-rays, alignment x-rays, knee examination, pain medication, a cane pass, a bottom bunk pass, and two types of alternative knee braces. (*Id*.).

36. In Dr. Figura's opinion, to a reasonable degree of medical certainty, she provided Mr. Harris with adequate medical treatment. (*Id*. at ¶ 23).

Plaintiff's Deposition Testimony Regarding Injuries

36. The plaintiff was able to walk and leave his cell without his braces.

Q:    Okay. So when you didn't have your braces, you were still leaving your cell and walking around the unit?

A:    Yes, and go sit down, yeah.

(Ex. 6, at p. 69: 9-12).

37. The plaintiff never fell or collapsed from not having a knee brace.

Q:    When you were at Corrigan from 2016 until you discharged, did your knee ever give out?

A:    I had little problems here and there, but no, it never buckled to where I fell, no. I had problems, you know, it hurted, but I never – it never fully collapsed.

(*Id*., at p. 71: 20-25).

38. The plaintiff's lack of knee brace never caused the plaintiff any additional pain that he did not already have from his knee condition.

Q:     Were you in any more pain when you didn't have your metal brace?

A:     No, I wouldn't say more pain, but I definitely noticed a difference.

(*Id*., p. 73: 6-9).

39. The plaintiff does not know whether his lack of knee brace caused his knee any further injury.

Q:     Okay.  When you were at Corrigan from 2016 until you discharged, you never further injured your knee from not having a knee brace?

A:     I don't know.  I don't know. . . .

(*Id*., p. 72: 11-14).

Administrative Remedies for Claims Against Officer Kudzal

40. DOC Administrative Directive 9.6 outlines the DOC inmate administrative remedy procedure.  AD 9.6 is attached to ARC King's affidavit as Attachment 1.  (See Ex. 4, Affidavit of ARC King, at ¶ 4).

41. AD 9.6 § 6(C) provides that a grievance (Level 1 administrative remedy) must be filed within 30 calendar days of the occurrence or discovery of the cause of the grievance.  (*Id*. at ¶ 5).

42. The directive further provides that an inmate may appeal a Level 1 disposition to Level 2 within five (5) calendar days of receipt of the decision. AD 9.6 § 6(K).  If an inmate does not receive a response to a Level 1, an inmate may file a Level 2 but it must be filed within 65 days from the date of the filing of the Level 1 grievance.  AD 9.6 § 6(M).  (*Id*. at ¶ 6).

43. The plaintiff, Leroy Harris #123415, was housed at Corrigan Radgowski CC from June 14, 2016 until September 21, 2017.  (*Id*. at ¶ 7).

44. According to AD 9.6, a Level 1 administrative remedy must be filed within 30 calendar days of the incident. ARC King has reviewed the grievance log for June through August of 2016, which shows that the plaintiff did not file any Level 1 or Level 2 administrative remedies (grievances) during this time period. (*Id*. at ¶ 9).

45. The plaintiff only filed one Level 1 grievance while at Corrigan Radgowski CC. This Level 1 grievance was filed on September 11, 2017 and was rejected as untimely. The plaintiff did not appeal this rejection. (*Id*. at ¶ 10).

46. The plaintiff has not exhausted administrative remedies for the incident that occurred on June 16, 2016. (*Id*. at ¶ 11).

<u>Administrative Remedies for Claims Against Dr. Figura and Nurse Knight</u>

47. The Connecticut Department of Correction (DOC) Administrative Directive 8.9 outlines the process for inmates to exhaust administrative remedies for health services. Attachment 1 to Nurse Brennan's Affidavit is AD 8.9. (See Ex. 5, Affidavit of HSR Coordinator Brennan, at ¶ 3).

48. At the request of the Office of the Attorney General, HSR Coordinator Brennan has reviewed the administrative remedy database for health reviews filed by inmates. (*Id*. at ¶ 4).

49. Mr. Leroy Harris #123415 has filed four health service reviews during his incarceration. He filed these health service reviews at MacDougall Walker CI in Suffield, CT on 2/21/2014, 2/16/2015, 4/29/2015, and 5/3/2015. (*Id*. at ¶ 5).

50. HSR Coordinator Brennan understands that Mr. Harris has filed a lawsuit regarding health services he received in 2016 at Corrigan Radgowski CC. Mr. Harris has not filed

any health service reviews since 2015 and therefore has not exhausted administrative remedies regarding this lawsuit.  (*Id*. at ¶ 6).

DEFENDANTS
DR. FIGURA, et al.

WILLIAM TONG
ATTORNEY GENERAL

BY: /s/ Robert S. Dearington.
Robert S. Dearington
Assistant Attorney General
Fed. Bar No. ct28862
110 Sherman Street
Hartford, CT  06105
Telephone No. (860) 808-5450
Fax No. (860) 808-5591
E-mail: Robert.Dearington@ct.gov

## **CERTIFICATION**

I hereby certify that on March 22, 2019, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's system.

 /s/ Robert S. Dearington
Robert S. Dearington
Assistant Attorney General